# In the United States Court of Federal Claims

No. 15-1069C

(Filed Under Seal: November 11, 2015)
(Reissued: November 25, 2015)

|  |  |
|---|---|
| **SPRINGFIELD PARCEL C, LLC,** ) | Post-award protest of lease subject to |
| ) | the Public Buildings Act, 40 U.S.C. |
| ) | § 3307; material terms of agency's |
| **Plaintiff,** ) | request for lease proposals; condition |
| ) | imposed by congressional committees |
| **v.** ) | on appropriations for the lease; |
| ) | contravention of material terms of request |
| **UNITED STATES,** ) | for lease proposals and of condition on |
| ) | appropriation; enforcement of limitation |
| **Defendant,** ) | on appropriation; the Anti-Deficiency |
| **and** ) | Act; 31 U.S.C. § 1341(a); injunction; |
| ) | declaration that lease is void |
| **EISENHOWER REAL ESTATE** ) |  |
| **HOLDINGS, LLC,** ) |  |
| ) |  |
| **Defendant-Intervenor.** ) |  |
| ) |  |

Alex D. Tomaszczuk, Pillsbury, Winthrop, Shaw, Pittman LLP, McLean, Virginia, for plaintiff Springfield Parcel C, LLC. With him on the briefs were Alexander B. Ginsberg and J. Matthew Carter, Pillsbury, Winthrop, Shaw, Pittman LLP, McLean, Virginia.

Devin A. Wolak, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Dorn C. McGrath, III, Kelley, Drye, and Warren LLP, Washington, D.C. for defendant-intervenor Eisenhower Real Estate Holdings, LLC. With him on the briefs were Holly A. Roth, William M. Jack, and Amba M. Datta, Kelley Drye & Warren LLP, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information. A hearing was held on November 25, 2015, to address

LETTOW, Judge.

     This post-award bid protest arises from a request for lease proposals ("RLP") by the General Services Administration ("GSA" or "government") for a new headquarters for the Transportation Security Administration ("TSA"). After a year-long negotiated-procurement process, GSA awarded the lease to Eisenhower Real Estate Holdings, LLC ("Eisenhower") on August 11, 2015. Another offeror, Springfield Parcel C, LLC ("Springfield"),[2] seeks a permanent injunction of the award to Eisenhower, asserting that GSA's action was contrary to law. Eisenhower was granted intervention to defend the award. Pending before the court are the parties' cross-motions for judgment upon the administrative record and the defendants' motions to dismiss. A hearing was held on November 3, 2015.

## FACTS[3]

### A. *GSA Seeks and Obtains Congressional Approval for a New TSA Headquarters*

     TSA is currently housed in five leased buildings spread across Northern Virginia. AR 4-359.[4] These five offices take up a total of 646,859 rentable square feet. AR 64-5094. Seeking to consolidate TSA into one location and to "improve[] space utilization," in 2014 GSA proposed a single replacement lease. AR 64-5094. By statute, *viz.*, the Public Buildings Act of 1959, codified as amended at 40 U.S.C. § 3301-16, agencies seeking to lease space with an annual rent in excess of $2.85 million must obtain approval for appropriations from the House of Representatives' Committee on Transportation and Infrastructure and the Senate Committee on

---

the parties' proposals. The resulting redactions are shown by brackets enclosing asterisks, *i.e.*, "[***]."

    [2]Springfield is a limited liability company wholly owned by Boston Properties Limited Partnership. Corporate Disclosure Statement, ECF No. 4.

    [3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), as well as from the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

    [4]Citations to the administrative record refer to the record filed on October 7, 2015. The record is paginated sequentially and is also divided into tabs. In citing to the administrative record, the court will first designate the tab, followed by page number, e.g., AR 14–414 refers to page 414, which is located in tab 14 of the record.

Environment and Public Works, 40 U.S.C. § 3307(a)(2).[5]  On January 8, 2014, GSA sent a
prospectus for the project to these committees.  AR 64-5094 to -5097.  The executive summary
of the prospectus proposed a "lease of up to 625,000 rentable square feet (RSF) of space" for
TSA.  AR 64-5094.  The "[d]escription" section of the prospectus also contained this limitation,
specifying a "[p]roposed [m]aximum RSF: 625,000."  AR 64-5094.  Additionally, a chart
attached to the prospectus listed the "Max RSF" of the "[p]roposed" lease as "625,000."  AR 64-
5097.

        The prospectus informed Congress that the new lease's 625,000 rentable square foot cap
would result in a 21,859 rentable square foot reduction in TSA's 2014 footprint (646,859 square
feet).  AR 64-5094.  A new lease thus would house TSA in a smaller footprint and also achieve a
better space "utilization rate," expressed as the "R/U" ratio, which is the measure of rentable
square feet over usable square feet.  AR 64-5094.  The prospectus included various other
conditions, including a "[m]aximum [p]roposed [r]ental [r]ate" of $39.00 per rental square foot, a
proposed rental term of 15 years, and a proposed rental locale of Northern Virginia.  AR 64-
5094.

        On February 11, 2014, the House Committee on Transportation and Infrastructure
adopted a resolution that said "pursuant to 40 U.S.C. § 3307, appropriations are authorized for a
replacement lease of up to 625,000 rentable square feet of space . . . for the . . . Transportation
Security Administration . . . at a proposed total annual cost of $24,375,000 for a lease term of up
to 15 years, a prospectus for which is attached to and included in this resolution."  AR 65-5098.
In addition, the resolution "[p]rovided that, the Administrator of General Services and tenant
agencies agree to apply an overall utilization rate of 153 square feet or less per person."  AR 65-
5098.

        On April 3, 2014, the Senate Committee on Environment and Public Works granted its
approval, resolving that "pursuant to title 40 U.S.C. § 3307, a prospectus providing for a
replacement lease of up to a maximum 625,000 rentable square feet of space . . . for
the . . . Transportation Security Administration . . . at a maximum proposed rental rate of $39.00
per rentable square foot, at a proposed total annual cost of $24,375,000 for a lease term of up to
15 years . . . is approved."  AR 66-5099.

### B.  GSA Issues a Request for Lease Proposals

        Thereafter, on July 14, 2014, GSA issued a Request for Lease Proposals ("RLP"), No.
2VA0687.  AR 14-414 to -856.  In pertinent part, the RLP required offerors to meet the
following conditions.  First, RLP Section 1.02(A) sought "a minimum of 550,000 . . . of
American National Standards Institute/Building Owners and Managers Association
(ANSI/BOMA) Office Area (ABOA) square feet," and a "maximum" of "625,000" rentable

_____

[5]The statute specifies that the threshold for leases is $1.5 million, but the Administrator of
GSA has authority to act pursuant to 40 U.S.C. § 3307(h) to adjust that amount.  In that regard,
GSA's Federal Management Regulation, Section 102-72.35, provides that the threshold will be
available on GSA's website.  For 2014, the threshold was $2.85 million per year.  *See* GSA
Annual Prospectus Thresholds, http://www.gsa.gov/portal/content/101522.

square feet. AR 14-417. ABOA and rentable square feet are terms of art with established definitions, which were set out in the RLP. Specifically, AR 14-448 shows a section entitled "General Terms, Conditions, and Standards" of Standard Lease GSA Form L201C, which according to RLP Section 1.01(B) is the form that defines terms used in the RLP. ABOA space includes space in which the tenant will house personnel and furniture. *See* AR 14-448. Contrastingly, rentable square feet includes ABOA space combined with "common areas such as elevator lobbies, building corridors, and floor service areas." AR 14-448 (describing the formula for determining rentable square feet and including ABOA square feet as a factor in that formula). Rentable square footage thus includes ABOA square footage. *See also* Hr'g Tr. at 78:17-19 (Nov. 3, 2015) (explaining that "usable [square footage] is always a subset of rentable [square footage]."). In short, RLP 1.02(A) sought a lease of a maximum of 625,000 rentable square feet, and a minimum of 550,000 ABOA square feet. These RLP requirements thus aimed to increase the efficient use of space within the building to be leased for TSA.

Next, RLP Section 4.04(C) provided that offers would be evaluated using a present-value price evaluation, as described in that section. AR 14-432 to -444. In that respect, "[e]valuation of offered prices w[ould] be based on the annual price per ABOA SF, including all required option periods." AR 14-433.

The RLP also contained a government-only provision in Section 5.01(B), which said that the government "shall have 100% sole tenancy" in the leased space. AR 14-435. This provision would apply whether or not the offeror offered a one building or multi-building leasehold. AR 14-435. No retail establishments would be allowed within the building absent a government direction. AR 14-435.

Additionally, RLP Section 5.01(K) set out extensive rules governing offerors' compliance with the National Environmental Policy Act. AR 14-436 to -437. An unnumbered paragraph at the end of this RLP section stated that "[a]ny offer that, in GSA's opinion, would require preparation of an E[nvironmental ]I[mpact ]S[tatement] shall be considered technically unacceptable and ineligible for award." AR 14-437.

### C. *Eisenhower and Springfield Make Offers, and GSA Begins Negotiations*

Eisenhower and Springfield responded to the RLP by making offers, as did two other entities. GSA focused its evaluations and negotiations on the Eisenhower and Springfield offers.

#### 1. *Eisenhower's offer and the resulting negotiations.*

Eisenhower responded to the RLP by making an offer on August 22, 2014. AR 21-896 to -2009. Eisenhower proposed to lease space in a pre-existing building called Victory Center, located at 5001 Eisenhower Avenue, Alexandria, Virginia. AR 21-898.[6] The offer represented that the existing building at Victory Center is a recently renovated single structure encompassing

---

[6]This opinion at times uses "Eisenhower" and "Victory Center" interchangeably. However, Eisenhower was the offeror, and Victory Center was the name of the building offered by Eisenhower.

550,000 ABOA square feet, AR 21-946, and that Eisenhower would build "an approximately [***] square feet seamless expansion on the building's south side," AR 21-899. Eisenhower's proposal would generate an R/U factor of 1.07539, AR 21-946, and a space efficiency rating of 148.20 ABOA USF per person, AR 21-898. Eisenhower also provided an "area analysis" of the building, which said the "total rentable area" of the building would be [***] rentable square feet. AR 21-1125.

On September 23, 2014, GSA drafted a memo titled "Negotiations – 9/23/14" that memorializes a discussion between GSA representatives and Eisenhower regarding the proposal. AR 24-2682. The memo said "[c]onfirmed [***] ABOA SF offered; [***] BRSF." AR 24-2682. The government requested a revised proposal from Eisenhower on October 20, 2014. AR 26-2689 to -2694.

On October 31, 2014, Eisenhower submitted a revised proposal that adjusted the amount of square footage offered to [***] ABOA square feet and [***] rentable square feet with [***] "General Purpose" square feet. AR 27-2785. In early December 2014, GSA representatives met with Eisenhower to discuss the proposal. AR 30-3471. This meeting was memorialized in a GSA memorandum entitled "TSA Revised Offer Discussions 12/4/2014 – 3:00 PM." AR 30-3471. The memorandum addressed several aspects of GSA's evaluation of the "test fit" of Eisenhower's building, including "concerns" about "mission support space," "panel creep," and [***]. AR 30-3471 to -3472. GSA and Eisenhower also discussed a "[n]ew raised floor feet requirement of [***] while meeting the ceiling requirement – amendment item." AR 30-3472. In addition, the Contracting Officer told Eisenhower that GSA could not exceed 625,000 rentable square feet. AR 30-3472 ("CO stated that he cannot exceed 625,000 sf rentable in the lease contract.").

On December 17, 2014, GSA issued Amendment No. 4 to the request for lease proposals, which modified Section 2.01(B) of the RLP. AR 19-886 to -889. The amendment provided that offerors "will have the option of increasing the ABOA square footage offered, if it does not exceed the maximum 625,000 rentable square feet (RSF) square footage in this RLP offer package. If the [o]fferor is already providing the maximum 625,000 rentable square footage and cannot house the [g]overnment's space requirements efficiently, then the [g]overnment will advise the [o]fferor that the offer is unacceptable." AR 19-886 (emphasis in original). This amendment was, in some ways, redundant, as the initial solicitation had already specified that a lease of a maximum of 625,000 rentable square feet was sought. AR 14-417.

Eisenhower submitted its final offer on January 15, 2015, AR 33-3480 to -3542. This final offer proposed a two-building solution, whereby Eisenhower would construct an annex proximate to the west side of the pre-existing building on the site. AR 33-3490 to -3491. The final offer explained that it was a response to the government's "test fit" concerns:

> Upon review of the government's test fit observations – specifically the observation regarding raised floors – the [o]fferor has determined that the optimal space solution for the tenant agency is to design and construct an approximately [***] Mission Support Annex directly to the west of the existing building. Per the updated test fit, the Mission

> Support Annex will house [***] TSA's conference facilities and
> additional specialty spaces. . . . The Mission Support Annex will . . .
> provide the flexibility to accommodate the raised flooring and desired
> finished ceiling height throughout.

AR 33-3490.  Eisenhower's final proposal in effect significantly changed its initial offering because it would solve test-fit issues by adding [***] rentable square feet to the pre-existing rentable square foot building on the Eisenhower site.  Together, the two buildings would total roughly [***] rentable square feet.  *See* AR 33-3527 to -3532 (providing overall area analysis for the two buildings).  AR 33-3506 reports the "Total Rentable Area" of the main building as [***] square feet, and AR-3509 reports the "Total Rentable Area" of the annex as [***] square feet.

Eisenhower's final-offer documents included a completed GSA Form 1364C, as required by RLP Section 3.03(B).  AR 33-3517 to -3518.  Under the heading "description of premises," Eisenhower wrote that the "General Purpose (Office)" space would total "[***] sq. ft."  AR 33-3517.  This was consistent with the building area analysis.  AR 33-3506, -3509.  Next, on line 10 of the form under the heading "space offered and rates," in "rentable square feet (RSF)," Eisenhower wrote "625,000."  AR 33-3517.  Eisenhower also said its offer would yield [***] ABOA square feet.  AR 33-3517.  Thus, Eisenhower's Form 1364C appeared to offer the government 625,000 rentable square feet of space, which would yield "[***]" ABOA square feet, out of a premises encompassing roughly [***] rentable square feet.  That would leave approximately [***] excess square feet, available in a government-only building.

Eisenhower's final proposal also included a chart depicting information about the rentable area per floor that to some extent contradicted its Form 1364C.  *See* AR 33-3511, -3532.  In particular, the chart listed "total floor rentable area" as being precisely "[***]" and ABOA square feet as being "[***]."  AR 33-3511, -3532.  Beneath the chart was also a note that said "24,207 Owner Provided."  AR 33-3511, -3532.  Of crucial significance was its ABOA square footage figure: the RLP required a minimum of 550,000 ABOA square feet, AR 14-417, yet Eisenhower's analysis showed only [***] ABOA square feet.  To solve that problem, Eisenhower offered [***] square feet of ABOA Joint Use Space, to bring the total ABOA square feet to [***].[7]   The chart also did not explain what "24,207 Owner Provided" meant.

---

[7]The Joint Use Space appears to have been designated under the criteria published in Building Owners and Managers Association International, *Standard Method For Measuring Floor Area In Office Buildings*, ANSI/BOMA Z65.1-1996, reproduced in Def.'s Supplemental Br. ("Def.'s Supp. Br.") App., at A14 through A50, ECF No. 41.  Under those criteria:

> *BUILDING COMMON AREA* shall mean the areas of the building
> that provide services to building tenants but which are not included
> in the *OFFICE AREA* or *STORE AREA* of any specific tenant.  *These
> areas may include, but shall not be limited to, main and auxillary
> lobbies, atrium spaces at the level of the finished floor, concierge
> areas or security desks, conference rooms, lounges or vending areas,
> food service facilities, health or fitness centers, daycare facilities,
> locker or shower facilities, mail rooms, fire control rooms, fully*

2. *Springfield's offer and the resulting negotiations.*

Springfield filed its initial offer on August 22, 2014.  AR 22-2011 to -2678.  It proposed to construct a new building near the Springfield Metro station.  AR 22-2014.  GSA undertook negotiations with Springfield in September of 2014, AR 23-2679, and Springfield submitted a revised offer on October 31, 2014.  AR 28-3046 to -3468.  Further negotiations occurred some time around December 4, 2014.  AR 29-3469.  At that time, a GSA memorandum memorialized the discussions as including concerns about the length of Springfield's building and the availability of mission support space.  AR 29-3469 to -3470.  In its final offer, Springfield proposed to construct and offer a [***] rentable-square-foot space, in which the government would have [***] ABOA square feet of space.  AR 34-3555.

### D. GSA Acknowledges on Multiple Occasions that Victory Center Does Not Comply with the RLP Square Footage Limitations

1. *An internal GSA memorandum concludes that Eisenhower's offer exceeds 625,000 rentable square feet.*

One month after Eisenhower's final offer, GSA internally acknowledged that Eisenhower's proposal in fact exceeded 625,000 rentable square feet.  In a memorandum titled "TSA HQ Procurement OMB & Central Office Briefing Paper" and dated February 25, 2015, GSA noted that the "lowest price [o]fferor has offered to provide approximately 20,000 additional RSF above 625k at zero cost to the [g]overnment in order to meet the 550k USF minimum efficiency layout minimum requirement.  The [g]overnment will not have to pay rent, operating costs nor real estate taxes on the additional space."  AR 68-5105.[8]  This memorandum appears to address the chart included as part of Eisenhower's final offer, indicating that the ABOA square footage was [***], well below the RLP's requirement of at least 550,000 ABOA square feet not counting the ABOA Joint Use Space.  AR 33-3511.  In addition, the memorandum's mention of 20,000 additional rentable square feet appears to refer to the "24,207 Owner Provided" note in the chart.  Overall, counting the Joint Use space, Eisenhower would be able to meet the 550,000 ABOA square footage minimum, but it would exceed the 625,000 rentable square footage maximum.

---

*enclosed courtyards outside the exterior walls, and building core and service areas* such as fully enclosed mechanical or equipment rooms.  Specifically excluded from *BUILDING COMMON AREA* are *FLOOR COMMON AREA*s, parking space, portions of loading

docks outside the building line, and *MAJOR VERTICAL PENETRATION*s.

*Id*. at A18 (emphasis added).

[8]The memorandum was an attachment to an e-mail sent by GSA's Contracting Officer to his colleagues at GSA on February 15, 2015.

Although GSA's internal memorandum recognized that Eisenhower's offer exceeded the 625,000 rentable-square-foot limit in the solicitation and the prospectus, it cautioned against disqualifying Eisenhower on this basis because it would lead to a pre-award bid protest by Eisenhower, which could cause expensive delays to GSA's procurement.  AR 68-5105 ("Disqualifying the lowest price [o]fferor on the basis of not allowing the acceptance of the additional space will likely result in a procurement protest, and thus having the [g]ov[ernment] assume schedule risk as well as the assumption of holdover penalty rent in its current primary leased location [***].  Additional leases will also go into holdover and require costly short term extensions.").  Contrastingly, the internal memo concluded that any bid protest challenging Eisenhower's excessive rentable square footage would be post-award and thus would not delay the project.  AR 68-5105 ("While there is a slight risk of protest from an unsuccessful [o]fferor, this will be post award and will not jeopardize the schedule for TSA thereby avoiding a [***] holdover rent delay risk to the [g]ov[ernment].").  The memorandum did not explain why a pre-award protest would lead to delays but a post-award protest would not.  Finally, the memorandum observed that under Eisenhower's proposal, "[t]he utilization rate is still below the OMB prescribed 150 sf per FTE."  AR 68-5105.

2.   *Four GSA officials sign a memorandum to file acknowledging that Eisenhower's proposal exceeds 625,000 rentable square feet.*

On April 16, 2015, the Contracting Officer wrote a draft memorandum that said Eisenhower's proposal was in excess of the 625,000 rentable-square-foot limit in the prospectus and in the RLP.  AR 70-5116.  The draft memorandum read:

> Please be advised that the following information is being documented as a Memo to the File to provide additional clarification to the terms of the FPR for the referenced property above [Victory Center – 5001 Eisenhower Avenue, Alexandria, VA].

> RLP No. 2VA0687 is a competitive procurement which required a minimum ANSI/BOMA Office Area (ABOA) Square Feet of 550,000 ABOA SF with a maximum of 625,000 Rentable Square Feet.  The square footage is subject to the Prospectus (No. PVA-04-WA14) threshold mandated by 40 USC 3307[] for the housing of the headquarters of the Transportation Security Administration ("TSA")[.]

> 5001 Eisenhower Avenue provided a timely FPR on January 15, 2015.  The terms of their final offer provided 625,000 RSF which equated to [***] ABOA SF.  The total square footage was provided in a combination of existing and new construction building(s).  *After the [g]overnment's analysis and review, it was determined that 5001 Eisenhower Avenue provided an additional 24,207 ABOA SF of Free Space as part of their offer* (not inclusive of the [***] ABOA SF) in order to promote a better space layout efficiency for the agency.  *The square footages have been measured and verified by the [g]overnment via test fits that were provided as part of their offer.*

AR 70-5116 (emphasis added).

The memorandum clarifies the meaning of the "24,207 Owner Provided" space in Eisenhower's offer documents: the owner was providing 24,207 ABOA square feet of space above and beyond the numbers listed in Eisenhower's Form 1364C.  This draft was then edited, and a final version was signed by the Contracting Officer and several other GSA officials on April 16, 2015.  AR 70-5107 to -5108.  This final version changed the wording to say that Eisenhower "may have provided" excess space:

> After the [g]overnment's analysis and review it was discovered that 5001 Eisenhower Avenue *may have provided* an additional 24,207 ABOA SF of Free Space as part of their offer (not inclusive of the [***] ABOA SF) in order to promote a better space layout efficiency for the agency.  The square footages have been measured and verified by the [g]overnment via test fits of *preliminary designs* that were provided as part of their offer.  Additionally, although the square footages have been verified, it is understood that the design for the new annex building has not been finalized, and thus measurements were performed on a "preliminary design".  Thus, *the final square footage could be greater than the 625,000 RSF depending on the finalization of the final design of the annex building.*  However, *this additional space, 24,207 ABOA SF of "free space" is currently contemplated as building amenity space of a cafeteria, fitness center with its associated locker room/bathroom space,* [***] *and NOT space that will . . . be permanently occupied by TSA GOV employees as office/conference/ meeting areas and in no event will be paid for by the [g]overnment.*  Thus, although no award has been made, 5001 Eisenhower Avenue is currently considered as the potential awardee.

AR 70-5107 (emphasis added).  This memorandum also explained that pursuant to Chapter 2 of the GSA Pricing Desk Guide, 4th Edition, space in excess of that required by a solicitation could be accepted as "free space."  AR 70-5107 to -5108.[9]

> *3.  GSA's revised scoring evaluation concludes Eisenhower's offer is greater than 625,000 rentable square feet.*

On August 5, 2015, a GSA broker sent an e-mail to Mr. Carter Wormeley asking: "[C]an you forward us what needs to be included in the lease file for Scoring?  Was a revised OA that reflects the free space in the Ad Hoc section[] finalized? Both items are requested by [GSA] for the lease file. Thank you."  AR 72-5142.

---

[9]Several months earlier, on February 5, 2015, the Contracting Officer had sent his colleagues at GSA an e-mail with excerpts from the Pricing Desk Guide.  The text of the email read: "FYI – excerpt from Pricing Desk Guide regarding 'free space.'  Supposedly, our 'policy' indicated we accept free space."  AR 67-5100.  This communication appears to be the first reference in the record to the "free space" issue.

In response, Mr. Wormeley wrote back on August 6, 2015 saying: "Attached is the scoring check with related documentation needed for the lease file. I vetted my work with GSA's Central Office, so it should be correct after jiggering the model to account for the free rent." AR 72-5142. Tab 72 of the administrative record does not contain a scoring sheet dated August 6, 2015. However, Tab 39 contains such a scoring sheet, signed by Mr. Wormeley and dated August 6, 2015. This scoring sheet says: "The PCPG[, *i.e.*, Project Case Planning Guide,] contains a constraint that does not allow an RSF override that creates an R/U factor less than 1.10, thus, the PCPG indicates [***] RSF rather than 625,000 RSF. For the levelization model to account correctly for the first 2 years of free rent, TI had to be added to the shell rate in Part 1 of the workbook and zeroed out in the breakdown of full service rent." AR 39-4067.[10] The scoring sheet also said "[b]ased on negotiated terms of lease with Lessor including 24,207 USF of space to be provided rent free." AR 39-4065.

### E.  The Government Performs a Present Value Price Evaluation

Section 4.03 of the RLP established that the lease would be awarded to the "lowest priced technically acceptable offer submitted," and it directed offerors "to the 'Present Value Price Evaluation' paragraph of this RLP." AR 14-432. Section 4.04, entitled "Present Value Price Evaluation," set forth the rules for evaluating the present value price of an offer. AR 14-432 to 434.

Section 4.04(C) provided that "[e]valuation of offered prices will be based on the annual price per ABOA SF, including all required option periods. The [g]overnment will perform present value price evaluation by reducing the prices per ABOA SF to a composite annual ABOA SF price, as follows." AR 14-433. The following paragraphs directed the evaluators to establish a "gross present value" of the cost by discounting annual rent by either 2.5% or 5%, depending on whether operating expenses would be adjusted annually. AR 14-433. Next, pursuant to Section 4.04(C)(7)(e), the government would determine an "amortized rental rate for the tenant improvement allowance." AR 14-434.

Respecting the physical aspects of the leased space, Exhibit B of the RLP stated that "[o]fferors shall provide the following building shell elements [such as ceilings, partitions, lighting, and plumbing], as described in the Lease, located within the [g]overnment's BOMA Office Area." AR 14-525. Then, "[t]he [g]overnment shall have the option, exercisable at the sole discretion of the [g]overnment within 180 days following lease award, to require the Lessor to increase, at no additional cost to the [g]overnment, the Tenant Improvements Allowance required by paragraph 1.08 of the Lease by the total amount of the Building Shell Credit in lieu of providing the foregoing building shell elements comprising the Building Shell Credit." AR 14-525. For the purpose of the pricing evaluation, Exhibit B set out that the "[g]overnment shall utilize the Building Shell Credit in accordance with the method for utilizing the Tenant Improvement Allowance for purposes of the comparison of the Lessor's offer in the pricing evaluation computation and to obtain the best economies for the [g]overnment." AR 14-525.

---

[10]In effect, because of the necessary calculating adjustment attributable to the low (and favorable) R/U factor, some of the "free space" was taken into account in the scoring sheet.

Applying this formula, GSA determined that the present value per USF for Eisenhower's offer was $[***], AR 37-4048, and the present value per USF for Springfield's offer was $[***], AR 38-4058.

### F.  *The Government Prepares an Environmental Assessment of Eisenhower's and Springfield's Offers*

Pursuant to Section 5.01(K) of the RLP, GSA analyzed the final offers of Springfield and Eisenhower for compliance with the National Environmental Policy Act ("NEPA"), codified as amended at 42 U.S.C. §§ 4321-47.  AR Tabs 47-50.  Section 5.01(K) expressly cited NEPA and provided that "[a]ny offer that, in GSA's opinion, would require preparation of an EIS[, *i.e.*, an Environmental Impact Statement under NEPA] shall be considered technically unacceptable and ineligible for award."  AR 14-437.[11]  This section also said:

---

[11]Pursuant to NEPA, federal agencies considering "major [f]ederal actions significantly affecting the quality of the human environment" must prepare an environmental impact statement.  42 U.S.C. § 4332(2)(C).  Actions with insignificant environmental effects do not require an EIS.  In that respect, "to reduce the administrative burden on agencies from NEPA, implementing regulations encourage agencies to develop 'categorical exclusions' or categories of actions that do not individually or cumulatively have a significant effect on the environment, and therefore do not require an EIS absent 'extraordinary circumstances.'"  *See National Post Office Collaborative v. Donahoe*, No. 3:13cv1406 (JBA), 2013 WL 5818889, at *11 (D. Conn. Oct. 28, 2013) (providing an overview of NEPA).  "If an agency's action is neither categorically excluded from nor clearly subject to the requirements of producing an EIS, an agency may prepare 'a more limited document, [called] an Environmental Assessment (EA).'"  *Id.* (quoting *Department of Transp. v. Public Citizen*, 541 U.S. 752, 757 (2004)).  "The EA is a 'concise public document' that 'briefly provides sufficient evidence and analysis for determining whether to prepare an EIS.'"  *Public Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a)).  "If, pursuant to the EA, an agency determines that an EIS is not required under applicable [Council on Environmental Quality] regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  *Id.* (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

Plaintiffs seeking to challenge an agency's NEPA decision generally bring an action in a federal district court under the Administrative Procedure Act and the federal-question jurisdictional statute.  *See Brodsky v. United States Nuclear Reg. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) (explaining that a district court reviews agency NEPA action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under Section 706(2)(A) of Title 5).  The district court's review "'focuses primarily on the procedural regularity of the decision,' rather than on its substance."  *Id.* at 118 (quoting *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1055 (2d Cir. 1985)).  "[A] court will review the administrative record to ensure 'that the agency examined the relevant data and articulated a satisfactory explanation for its action.  Moreover, the agency's decision must reveal a rational connection between the facts found and the choice made.'"  *Id.* at 119 (quoting *Natural Res. Def. Council, Inc. v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011)).  "Thus, when an administrative record is insufficient to permit a court to discern an agency's reasoning or to conclude that the agency has considered all relevant factors, a court may remand the matter to

"Any offer must provide a basis for GSA to determine that award of a
lease involving the offered building(s) will, under [NEPA] either result
in: 1) a Categorical Exclusion (CATEX) from the requirement to prepare
an Environmental Assessment (EA) or an Environmental Impact Statement
(EIS), or 2) Finding of No Significant Impact (FONSI) as the result of
performing an EA.

AR 14-437.

To make this determination, GSA hired the consulting firm Stantec to assist with the
preparation of an EA. *See* AR 50-4493 to -4961 (showing e-mails and memoranda between
GSA and Stantec regarding NEPA compliance). On April 10, 2015, a Stantec associate [***] e-
mailed GSA asking for the "site plan" of the "Alexandria property." AR 50-4664. GSA replied
that same day with an e-mail attachment titled "Victory Center (site plan & schematics) (FPR)."
AR 50-4666. Ms. [***] replied, saying: "These are good for the proposed projects. In addition
to this, we will need existing conditions site plans for both properties, something that allows us .
. . to compare against existing conditions." AR 50-4666. The Victory Center documents
attached to the e-mail included an artistic rendering of the site as consisting of two buildings.
AR 50-4673 to -4674, -4678.

GSA again e-mailed Ms. [***] on April 16, 2015, with e-mail attachments titled
"EXISTING" and "PROPOSED." AR 50-4716. These attachments included two-dimensional
aerial views of the Victory Center site that appear to show the space without the proposed annex
and with the proposed annex. AR 50-4718 to -4723.

Although these April e-mails show that the plans regarding the proposed annex were
sent to GSA's environmental consultants during that month, later e-mails suggest that the
environmental consultants were not fully cognizant of the annex. For example, on May 27,
2015, GSA's NEPA specialist [***] e-mailed GSA's real estate broker about the updated site
plans: "Can you, please, ask the offeror to send me the most current site plan?" AR 50-4814.
GSA's broker replied that same day: "I forwarded what they sent me to you on May 19th. Was
that not sufficient? Is this most current site plan needed for the FONSI/EA? I don't understand.
I thought Stantec had all of this already." AR 50-4815. Within the same hour, the GSA broker
again e-mailed Mr. [***] saying: "[***] – thanks for discussing with me and clarifying the
request. I forwarded Stantec's request to the [o]fferor and copied you & [***]. Here's the most
current site plan that was part of their FPR *which depicts the new construction for the Annex*.
Thank you!" AR 50-4817 (emphasis added).

At this point the "final EA/FONSI" was scheduled "to go out for public review on June
10th so that the comment period would end before the period of performance 6/25." AR 50-4846

---

the agency to allow for supplementation of the record." *Id.* (citing *Florida Power & Light Co. v.
Lorion*, 470 U.S. 729, 744 (1985); *National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir.
1997)).

(e-mail from Ms. [***] to Mr. [***], dated June 2, 2015).[12]  In June, GSA published the Environmental Assessment that it had developed with assistance from Stantec.  AR 47-4191 to -4350.  The EA explained the Victory Center proposal as follows: "The site currently consists of an unoccupied 606,000 GSF office building and two surface parking lots . . . .  The existing building would be renovated and a new 6-story parking garage would be built on top of one of the surface lots.  In order to meet the requirements of the RLP, the existing building would undergo an expansion consisting of 60,000 GSF of office space and 10,000 GSF of retail space."  AR 47-4218.

This description in the EA inaccurately portrayed the Eisenhower proposal, but elsewhere the EA mentioned that "additional structures" would be built, and it referred to a "building addition."  AR 47-4222.  The EA's soil analysis also referenced a "4-story addition."  AR 47-4222; AR 47-4249.  And, the EA's environmental contamination analysis said that "[c]onstruction of the proposed parking garage and addition would require the excavation of existing soils on the east and west sides of the existing building," AR 47-4251, thus in effect referring to an annex with [***] square feet of space because it would be built to the west of the existing building.

After publishing the EA, a FONSI was issued on July 17, 2015.  AR 49-4484 to -4492.  Using identical language from the EA, the FONSI describes Victory Center as "consist[ing] of an unoccupied 606,000 GSF office building and two surface parking lots. . . . The existing building would be renovated and a new 6-story parking garage would be built on top of one of the surface lots.  In order to meet the requirements of the RLP, the existing building would undergo an expansion consisting of 60,000 GSF of office space and 10,000 GSF of retail space."  AR 49-4486.  The FONSI makes no reference to a new annex consisting of [***] square feet of space.

GSA received at least two comments on the EA and FONSI for Victory Center. AR 79-5358 to -5359, -5362 to -5363.  One of those comments came from Jeffrey McKay, Lee District Supervisor, Fairfax County, on August 24, 2015, expressing concern about traffic.  AR 79-5362.

In addition to evaluating Eisenhower's offer, the EA and FONSI also evaluated Springfield's offer for NEPA compliance.  AR 47-4221 (EA describing Springfield as a 653,000 GSF building); AR 49-4486 (portion of the FONSI describing Springfield's site).

GSA concluded that no EIS was needed for either Eisenhower's or Springfield's offers.

### G. Springfield Writes to GSA Requesting a Storm Water Easement

On July 31, 2015, eleven days before GSA announced the winning offeror, Springfield wrote to GSA regarding a storm water easement.  Springfield advised GSA that it would need "to commence this work as soon as possible" to meet TSA's schedule.  AR 82-5377.  "During

---

[12]Near this time, the Virginia Department of Environmental Qualify completed a Federal Consistency Determination of Victory Center, which also reviewed the annex.  AR 50-4876 to -4890.  A public comment period was allowed on this determination as well.

the early stages of development of the project, [Springfield] will need to capture on site drainage and pipe it underground to an existing outfall.  This storm drain conveyance system will cross Springfield Center Drive . . . traverse the [federal government] property and outfall in an existing rip-rap structure located on WMATA property."  AR 82-5377.  "If acceptable to the GSA, [Springfield] would like an easement to construct and maintain this drainage easement on the [federal government] [p]roperty."  AR 82-5377.  The record does not show that GSA ever responded to this letter.

Springfield's storm water drainage plan had been previously transmitted to GSA as part of its revised offer, which included proffers made to Fairfax County that described a pre-existing 18-inch drainage pipe as providing adequate storm water drainage.  AR 28-3073.

### H.  *GSA Awards the Lease to Eisenhower and Expressly Accepts Space in Excess of the 625,000 Rentable Square Feet Limitation*

On August 11, 2015, GSA awarded the lease to Eisenhower.  AR 60-5040.  The parties signed the lease that same day.  AR 60-5041 to -5089.  Section 1.01(A) of the lease described the premises as "625,000 rentable square feet (RSF), yielding [***] ANSI/BOMA Office Area (ABOA) square feet (SF)."  AR 60-5045.  Section 7.03 of the lease, titled "free rent and free space," said:

> The Lessor shall provide up to 24,207 ABOA SF of above-grade, free space in order to meet the program of requirements contained in this Lease.  The free space shall be provided at a warm-lit shell condition and shall not be part of any costs including but not limited to, operating expenses and real estate taxes.  The free space shall not be provided any tenant improvement allowances.  The free space shall be serviced and maintained as part of the leased premises in accordance with the terms of the Lease.

AR 60-5084.

On August 13, 2015, GSA informed Springfield that it had lost the competition.  AR 62-5092.  On August 19, GSA sent Springfield a written debriefing letter "[i]n accordance with FAR § 15.506(b)."  AR 63-5093.  The letter said Springfield had "submitted a responsive, technically acceptable offer.  The [g]overnment did not identify any significant weaknesses or deficiencies."  AR 63-5093.  "Overall," Springfield "received the second (2nd) lowest total evaluated price on a Present Value Price Evaluation basis."  AR 63-5093.  The letter explained that Eisenhower had prevailed because it "submitted a proposal with a total evaluated price of $[***] on a Present Value Price Evaluation basis.  SUCCESSFUL OFFEROR was the lowest priced technically acceptable offer."  AR 63-5093.  In contrast, GSA said Springfield's offer was for $[***] on a Present Value Price Evaluation.  AR 63-5093.

I. *Protest Proceedings*

On August 24, 2015, Springfield filed a protest at the Government Accountability Office ("GAO"). AR 1-1. In its initial GAO protest, Springfield challenged the NEPA compliance determination, the present value analysis, and several other issues. AR 1-2. On September 8, 2015, however, Springfield's counsel received an anonymous letter that asserted the Eisenhower space was too large. Compl. Ex. C. Springfield filed a supplemental GAO protest on September 18, 2015, raising this new issue. AR 3-334 to -335.

During a September 10, 2015 phone conversation with government's counsel, Springfield's counsel came to believe that there was no termination-for-convenience clause in the Eisenhower lease. *See* Transcript of Hearing on Application for Temporary Restraining Order (Sept. 25, 2015) ("TRO Hr'g Tr.") at 9:9-14, ECF No. 17. This fact was seemingly important because a termination-for-convenience clause can allow the government to cancel a contract in the event that a losing offeror makes a successful post-award bid protest. *See* John Cibinic, Jr., et al., *Administration of Government Contracts* 1076 (4th ed. 2006) (explaining how the government may use a termination-for-convenience clause to cancel a contract after a post-award bid protest, without incurring liability for breach of contract). On September 22, however, Springfield's counsel learned that there was a limited termination-for-convenience clause in Section 7.09 of the Eisenhower lease. *See* TRO Hr'g Tr. 9:21-23. That clause provided that the

> [g]overnment may terminate the Lease for convenience, in whole or in part, within forty-five (45) days of Lease execution only if the Contracting Officer, in his discretion, determines that a public comment(s) from the Public Review (PR) of the Environmental Assessment (EA) of 5001 Eisenhower Avenue, Alexandria, Virginia has merit and would impact work related to the existing building(s) and proposed new construction that would prevent the completion of the project. The Lease may not be terminated for convenience for any other reason.

AR 60-5086. Because the lease was signed on August 11, the 45-day time limit in Section 7.09 would expire on September 25, 2015.

On September 25, Springfield filed a complaint in this court, along with an application for a temporary restraining order to arrest the expiration of Section 7.09 of the lease. Compl. ¶¶ 25-27; Pl.'s Mot. and Mem. in Support of the Issuance of a Temporary Restraining Order and Preliminary Injunction ("Pl.'s Mot. for TRO"), ECF No. 2. Springfield argued that unless this court halted the running of the 45-day limit on Section 7.09, the government would not be able to terminate the contract for convenience, posing a higher hurdle for Springfield to overcome in seeking injunctive relief if the court found GSA to have violated procurement law in making the award to Eisenhower. Pl.'s Mot. for TRO at 26-27. The court held a hearing on the same day, with all parties present. The court granted a TRO that day, enjoining the expiration of Section 7.09 until October 9, 2015. Order on Motion for TRO, ECF No. 12. On September 30, the parties consented to extending the TRO until November 12, 2015, on condition that the court would resolve the case by that time. *See* Joint Status Report, ECF No. 13. An expedited briefing schedule was established for motions for judgment on the administrative record, in

contemplation that the court would endeavor to resolve the case by November 12, 2015, 48 days after the complaint was filed.  Scheduling Order (Oct. 1, 2015), ECF No. 14.

## JURISDICTION

### A.  *28 U.S.C. § 1491(b)(1)*

Pursuant to the Tucker Act, this court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1), added by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).

### B.  *Standing*

The defendants argue that Springfield does not have standing to bring this protest because its bid was non-responsive.  Def.'s Mot. to Dismiss, Cross-Mot. for Judgment on the Administrative Record & Resp. to Pl.'s Mot. for Judgment on the Administrative Record ("Def.'s Mot.") at 6-10, ECF No. 29; Def.-Interv.'s Mot. to Dismiss, Cross-Mot. for Judgment on the Administrative Record, & Opp'n to Pl.'s Motion for Judgment upon the Administrative Record ("Def.'-Interv.'s Mot.") at 17-25, ECF No. 28.[13]  Their theory is that Springfield's project required a storm water easement across federal property, and that Springfield neither acquired the easement nor informed the Contracting Officer of this need.  Def.'s Mot. at 6-10; Def.-Interv.'s Mot at 17-25.  Defendants contend that Springfield failed to comply with RLP Section 5.01, which provides that the "Offeror shall provide a stormwater management plan for the offered site," and must show that "all required site plan approvals are complete and in place such that no other approvals – other than building permits – would be required to construct and/or occupy the offered building(s)."  AR 14-437, -435; Def.'s Mot. at 8; Def.-Interv.'s Mot. at 17-18.

---

[13]Defendant and defendant-intervenor both styled a portion of their briefs as a "motion to dismiss," but neither party cited RCFC 12.  The court understands the parties' submissions as motions to dismiss pursuant to RCFC 12(b)(1).  When assessing a motion to dismiss under RCFC 12(b)(1), the court will "normally consider the facts alleged in the complaint to be true and correct," *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988), although the court may find jurisdictional facts by looking to evidence outside the pleadings, including declarations, *see Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the [d]istrict [c]ourt's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist."), *overruled by implication on other grounds by Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).  "A plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

Only an interested party has standing to challenge the award of a contract in a bid protest. 28 U.S.C. § 1491(b)(1). "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013). A direct economic interest is shown by demonstrating that the disappointed bidder had a "substantial chance" of winning the award. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (quoting *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). If a bid is unresponsive, that bidder does not have a substantial chance of receiving the award. *See Myers*,

275 F.3d at 1370-71 (holding that a protestor "must show that it would have been a qualified bidder.").

Here, defendants acknowledge that Springfield was an actual bidder. *See* Def.'s Mot. at 7. The dispute centers upon whether Springfield's bid was non-responsive for failure to acquire all necessary approvals for its storm water management plan. As proof that Springfield failed to acquire a necessary storm water easement, defendants point to the letter dated July 31, 2015 from Springfield to the GSA's regional commissioner. Def.'s Mot. at 7; Def.-Interv.'s Mot. at 17-18. In pertinent part, the letter said Springfield "will need to capture on site drainage and pipe it underground to an existing outfall" and that "[i]f acceptable to GSA, [Springfield] would like an easement to construct and maintain this drainage easement on the [federal government] Property." AR 82-5377. Because the letter uses the words "will need," the defendants contend that Springfield's proposal required an easement over federal property, which they did not receive. Def.'s Mot. at 8; Def.-Interv.'s Mot. at 17-18.

For two reasons, the record does not support the defendants. First, Springfield's letter of July 31, 2015 is not proof that Springfield requires an easement. Instead, the letter requests the easement for convenience, because it would allow Springfield to develop the site more quickly. AR 82-5377 ("*If acceptable* to GSA, [Springfield] *would like* an easement to construct and maintain this drainage easement on the [federal government] Property." (emphasis added)). Consistent with RLP Section 5.01, Springfield in fact had an adequate storm water management plan in place, and it had communicated that plan to GSA during negotiations. *See* AR 28-3135 (setting out records of communications with Fairfax County regarding storm water piping, explaining that the pre-existing 18-inch storm water pipe was adequate to provide drainage).

Second, a civil engineering agent for Springfield, [***], has supplied a declaration that avers that no new easement was necessary to develop the Springfield site in a timely manner. Pl.'s Resp./Reply in Support of Its Mot. for Judgment on the Administrative Record ("Pl.'s Reply") Attach. 1 (Decl. of [***] (Oct. 27, 2015) ("[***] Decl.")), at ¶ 1, ECF No. 30-1. The government argues that this court should not consider the [***] Declaration because it was "late-submitted" as an attachment to Springfield's response and reply brief to defendants' cross-motions for judgment on the administrative record. *See* Def.'s Reply in Support of Its Mot. to Dismiss and Cross-Mot. for Judgment upon the Administrative Record ("Def.'s Reply") at 3, ECF No. 36. Nonetheless, the rules of this court permit consideration of Springfield's *response* to defendant's cross-motion, which first raised a question about the storm water easement. *See* RCFC 7(b)(1) (providing that "[a]ny motion, objection, or response may be accompanied by a brief . . . and, if necessary, affidavits . . . ."). Plaintiff's brief was both a reply in support of its

motion for judgment and a response to defendants' cross-motions.  Because the [***]
Declaration "was timely filed as an affidavit supporting [plaintiff's] response to the [defendant's]
motion, which first raised the standing issue," this court may consider the declaration as evidence
of standing.  *See Idaho Conservation League v. United States Forest Serv.*, No. 2:12-cv-00004-
REB, 2014 WL 912244, at *2 (D. Idaho Mar. 10, 2014) (permitting and relying upon a
declaration in a response to a cross-motion for summary judgment, when that declaration was
offered to show standing).[14]

      Accordingly, the court finds Springfield was an actual bidder that "submitted a
responsive, technically acceptable offer."  AR 63-5093 (GSA debriefing letter).  In addition,
Springfield's offer was "the second (2nd) lowest total evaluated price."  AR 63-5093.  "[A]s the
second low bidder," Springfield "would have had a substantial chance of being awarded the
contract."  *Coastal Envtl. Grp., Inc. v. United States*, 118 Fed. Cl. 1, 10 (2014).  Springfield
therefore has standing to pursue its protest.

## STANDARDS FOR DECISION

      The Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706, governs the
court's review of an agency's contract award.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under
this subsection, the courts shall review the agency's decision pursuant to the standards set forth
in section 706 of title 5.").  "Section 706 of the APA provides, in relevant part, that a 'reviewing
court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to
be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
*Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (alterations in original)
(quoting 5 U.S.C. § 706(2)(A)).  Under these standards, the court may set aside a procurement
action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement
procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom.
Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

      When challenging the rationality of an award, "the disappointed bidder bears a heavy
burden."  *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1333).  In negotiated
procurements, that burden "is greater than in other types of bid protests."  *Galen Med. Assocs.,
Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  Nevertheless, "[c]ourts have found
an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider
an important aspect of the problem, offered an explanation for its decision that runs counter to
the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to
a difference in view or the product of agency expertise.'"  *Alabama Aircraft Indus., Inc.-
Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle*

---

    [14]Defendant cites *Brooks Range Contract Servs., Inc. v. United States*, 101 Fed. Cl. 699,
708-10 (2011) for the proposition that "a protestor is not entitled to wait until a reply brief to
address known questions about its standing."  Def.'s Reply at 3 n.1.  In *Brooks Range*, until its
reply brief, the protestor had not addressed the issue of prejudice in any way.  On those facts, the
court found the issue regarding prejudice was waived.  *Brooks Range* is inapposite here because
it deals with an affirmative element of the protestor's case, *i.e.*, prejudice, not a response to a
defendant's factual contention against jurisdiction.

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (the court may not "substitute its judgment for that of the agency." (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))).

When a challenge is brought on the second *Impresa* ground, *i.e.*, a violation of statute, regulation, or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Cyios Corp. v. United States*, 122 Fed. Cl. 726, 737 (2015) (quoting *Impresa*, 238 F.3d at 1332-33).

## ANALYSIS

Springfield's main argument is that Eisenhower's offer failed to comply with GSA's solicitation, because it offered space in excess of 625,000 rentable square feet.  *See* Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Mot."), ECF No. 25-1, at 20-24.  Springfield contends that several FAR provisions, as well as Federal Circuit case law, prohibit the agency from selecting an offeror who fails to submit an offer within the terms of the solicitation.  Pl.'s Mot. at 20-21.  Springfield also asserts that GSA violated the Public Buildings Act, specifically 40 U.S.C. § 3307(a), because Congress authorized appropriations only for a building with a maximum of 625,000 rentable square feet.  Pl.'s Mot. at 24.  The defendants respond that Springfield has, in part, misinterpreted Eisenhower's offer, contending that it does not exceed 625,000 rentable square feet.  *See* Def.'s Mot. at 11-15; Def.-Interv.'s Mot. at 25-27.  In defendants' view, any overage is acceptable because GSA's Pricing Desk Guide permits the acceptance of space in excess of a maximum set in the solicitation, so long as that space is "free." Def.'s Mot. at 15; *see also* Def.-Interv.'s Mot. at 27 (citing AR 70-5107).

The parties' secondary contentions are less significant to the outcome.

A.  *Whether GSA Contravened a Material Term of the RLP by Selecting Eisenhower's Offer for a Space Larger than 625,000 Rentable Square Feet*

Pursuant to GSA's regulations, the "contracting officer must evaluate offers solely in accordance with the factors and subfactors stated in the S[olicitation for ]O[ffers]."  48 C.F.R. § 570.306(a); *see also* 48 C.F.R. § 570.102 ("Solicitation for Offers (SFO) means a request for proposals.").  "If the Government's requirements change, either before or after receipt of proposals, issue an amendment."  48 C.F.R. § 570.303-4(a).[15]  These regulations have been interpreted to show "not only that the [GSA] has no obligation to consider nonconforming offers on the merits, but that it would be improper to do so without first changing the solicitation and

_____

[15]Elsewhere, 48 C.F.R. § 15.206(d) provides that "[i]f a proposal of interest to the [g]overnment involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection."

notifying other bidders." *Tin Mills Props., LLC v. United States*, 82 Fed. Cl. 584, 590 (2008). This interpretation is supported by the Federal Circuit's decision in *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999). In *Alfa Laval*, the court of appeals observed that 10 U.S.C. § 2305(b)(1) required the agency to "make an award based solely on the factors specified in the solicitation," and that then-extant 48 C.F.R. § 15.606(a), (c) (1996) required the government to "issue a written amendment to a solicitation" when it "changes, relaxes, increases, or otherwise modifies its requirements." *Id.* Based on these provisions, the Federal Circuit concluded that the Navy erred by awarding a contract to a bidder whose offer "failed to comply" with the terms of the solicitation. *Id.* at 1367-68. The language of 48 C.F.R. §§ 570.303-4(a) and 570.306(a) is nearly identical to the regulations and statutes at issue in *Alfa Laval*.

Consistent with these regulations and precedents, the Federal Circuit has generically held that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (1996); *see also Centech*, 554 F.3d at 1038 (quoting *E.W. Bliss* for this proposition). "A provision in a solicitation is material 'if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured.'" *Per Aarsleff A/S v. United States*, 121 Fed. Cl. 603, 630 (2015), *appeals pending*, Nos. 2015-5111, -5112, -5135, -5143 (Fed. Cir.) (quoting *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 518 (2012) (in turn citing *Centech*, 554 F.3d at 1038)).

Case law does not sharply distinguish between the "material terms" doctrine of *E.W. Bliss* and the regulations in Title 48 of the C.F.R. that require evaluation of offers solely on the factors in a solicitation. Some decisions cite only the regulations, while others cite only the "material terms" doctrine. *Compare AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009) (citing FAR § 15.305(a) for the proposition that agencies must rely solely on the factors in the solicitation, but omitting to discuss "material terms"), *with Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 505 (2009) (citing *E.W. Bliss* for the "material terms" test, without citing any regulations). Both bases for the general doctrine essentially convey the same principle without any meaningful difference.

The record shows that Victory Center exceeds 625,000 rentable square feet by at least 24,207 rentable square feet. The final, signed lease provides that the lessor "shall provide up to 24,207 ABOA SF of above-grade, free space. . . . The free space shall be serviced and maintained as part of the leased premises in accordance with the terms of the Lease." AR 60-5084 (Executed Lease Section 7.03). The final, signed occupancy agreement also includes this space. AR 73-5160. Moreover, GSA's own internal memos show that GSA knew that Victory Center was over 625,000 rentable square feet. *See* AR 68-5105; AR 70-5116; AR 70-5107. Pursuant to the terms of the lease, rentable square feet means ABOA square feet plus common areas. AR 14-448 (showing a Standard Lease GSA Form L201C, which by RLP 1.01(B) is the Form that defines terms used in the RLP). Thus, this ABOA "free space" must be included in

the rentable figure.  GSA's own memos reach this same conclusion, saying the free space will cause rentable square footage to exceed 625,000.  AR 68-5105; AR 70-5116.[16]

Moreover, Eisenhower's offer in fact required this 24,207 ABOA square feet of space "in order to meet the 550k USF minimum efficiency layout minimum requirement."  AR 68-5105.[17]  RLP Section 1.02(A) and Amendment No. 4 categorically provided that no offer could exceed 625,000 rentable square feet.  AR 14-417; AR 19-886.  Section 1.02(A) also provided that no offer could provide less than 550,000 ABOA square feet.  AR 14-417.  Such offers would be "unacceptable."  AR 19-886.

Applying 48 C.F.R. § 570.306(a) and 48 C.F.R. § 570.303-4(a), the court finds that GSA ignored RLP Section 1.02(A) and Amendment No. 4, and it thus failed to "evaluate offers solely in accordance with the factors" in the solicitation.  48 C.F.R. § 570.306(a); *Tin Mills Props.*, 82 Fed. Cl. at 590; *see also* 48 C.F.R. § 570.303-4(a) (requiring the government to amend the solicitation if the government's requirements change); *Alfa Laval*, 175 F.3d at 1368 (finding agency violated procurement law, based on regulations and statutes with nearly identical language to 48 C.F.R. §§ 570.303-4 and 570.306(a)); *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 788-89 (2009) (same).  Correlatively, the maximum rentable square feet specified in the RLP constituted a "material term" of this leasehold procurement, and the court finds GSA's selection of Eisenhower violated the material terms of the solicitation.  The size of the leased space, as stated in RLP 1.02(A) and Amendment No. 4, was a material term because it addressed the "quantity" of space delivered.  *See Blackwater*, 86 Fed. Cl. at 505.  The size of the space is also essential to determining "price."  *See Centech*, 554 F.3d at 1038 (finding solicitation provision material when it affected the cost evaluation).  Finally, the 625,000 rentable square foot limitation was essential to the lease's "quality," *Blackwater*, 86 Fed. Cl. at 505, because this limitation was stated in the congressional resolutions authorizing the lease in an effort to reduce TSA's footprint and increase its space utilization rate.  *See* AR 66-5098, AR 66-5099.  The House resolution stated expressly that "appropriations are authorized for a replacement lease of up to 625,000 rentable square feet."  AR 65-5098.  Likewise, the Senate resolution stated expressly that it approved of "a replacement lease of up to a maximum 625,000 rentable square feet of space."  AR 66-5099.

Defendants nonetheless argue that GSA may accept space in excess of the 625,000 rentable limit in the solicitation because GSA's Pricing Desk Guide permits the government to accept space above any maximum stated in a solicitation, so long as that space is "free."  Def.'s Mot. at 15; Def.-Interv.'s Mot. at 27.[18]  The Pricing Desk Guide provides that "[w]hen an offeror

---

[16]The government concedes that there would be a substantial amount of unoccupied space in the government-only set of Victory Center buildings, which all parties agree contain roughly [***] square feet of space.  *See* Def.'s Mot. at 12; *see also* AR 33-3517.

[17]USF refers to "usable square feet," which means ABOA square feet.

[18]*See* Def.-Interv.'s Mot. at 27 ("As noted above, Victory Center included in its offer 24,207 SF of building amenities that is not part of any cost to the [g]overnment.");  Def.'s Mot at

has a contiguous block of space that exceeds the maximum amount for which [the GSA ]P[ublic ]Buildings ]S[ervice] has solicited, it may offer this space at no charge to the government. When the offered space exceeds the maximum SFO requirement, the tenant agency must be consulted." GSA Public Buildings Service, *Pricing Desk Guide*, § 2.17.1 (4th ed., Oct. 3, 2011). The "tenant agency must agree to accept" or "reject the additional square footage." *Id.* Moreover, if the lease is subject to a prospectus, "further guidance" from the central office must be sought. *Id.* According to the government, "[e]ach of these requirements were followed by the Contracting Officer, including the specific requirement applicable to prospectus-level leases" of getting guidance from the central office. Def.'s Mot. at 15. In the circumstances, the government avers that it "may accept" the additional space. Def.'s Mot. at 15.

Springfield responds that the Pricing Desk Guide is inapplicable because it is contradicted by 48 C.F.R. § 570.306, Pl.'s Reply at 13 n.4, and that it cannot apply because it was not incorporated into the solicitation, a contention that the defendants admit, Hr'g Tr. at 62:4-6 (Nov. 3, 2015) (government's counsel's conceding that the Pricing Desk Guide was not incorporated into the RLP); Def.'s Reply (omitting to argue that guide was incorporated into the solicitation); Def.-Interv.'s Reply (same).

This court concurs that the Pricing Desk Guide cannot trump applicable regulations. The Guide was not "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 824-44 (1984)). There is "no indication that Congress meant to delegate authority" to GSA to publish guides with the force of law nor "that [GSA] set out with a lawmaking pretense in mind when" it drafted the guide. *United States v. Mead Corp.*, 533 U.S. 218, 232-33 (2001). The Pricing Desk Guide does not even purport to be law – its introduction says the "Pricing Desk Guide (PDG) presents the policies used by the Public Buildings Service (PBS). . . . It is designed to guide PBS employees." *Pricing Desk Guide*, § 1. Although in other circumstances, the Pricing Desk Guide may have some persuasive power under the rule of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the court cannot defer to an agency policy that contradicts a regulation's plain language, *see Eldredge v. Dep't of Interior*, 451 F.3d 1337, 1343 (Fed. Cir. 2006) (no *Skidmore* deference to agency interpretation "contrary to the plain language" of a regulation); *see also Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1340 (Fed. Cir. 2003) (finding agency manuals "lack[ed] the force of law"), or material terms of the RLP, *see Centech*, 554 F.3d at 1039 (holding that the Air Force "could not, through [a] Policy Memorandum, alter the requirements of the L[imitation ]o[n ]S[ubcontracting] clause, which was mandated by statute and regulation.").[19]

---

15 ("Victory Center proposed RSF in its facility within the 625,000 prospectus ceiling, and it included other space at no-cost so that its proposal would meet other requirements of the RLP.").

[19]The Pricing Desk Guide cites 41 C.F.R. § 102-85 as authority, saying it "outlines the basis of the pricing policy detailed in the PDG." To the extent the guide purports to interpret agency regulations, it would be subject to deference under the rule of *Auer v. Robbins*, 519 U.S. 452, 461 (1997). However, "*Auer* deference is warranted only when the language of the

In summary, the court finds that GSA's action contravened 48 C.F.R. §§ 570.303-4 and 570.306(a) and violated the material terms of the solicitation, contrary to the rule of *E.W. Bliss*. GSA's Pricing Desk Guide does not alter this outcome, because it lacks the force of law.[20]

## B. *Whether GSA Violated 40 U.S.C. § 3307*

Before the GSA leases space with an annual rent in excess of $2.85 million, it must seek congressional approval. 40 U.S.C. § 3307(a)(2); *see supra*, at 2 n.5 (describing GSA's adjustment of the statutory dollar threshold). For such leases, "appropriations may be made only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made." 40 U.S.C. § 3307(a). To secure this approval, GSA "shall transmit to Congress a prospectus of the proposed facility." 40 U.S.C. § 3307(b).

In Springfield's view, GSA could not select a building larger than 625,000 rentable square feet, because that limitation was included in the congressional committees' resolutions approving GSA's prospectus for the TSA headquarters. Pl.'s Mot. at 24. The defendants disagree, arguing that Section 3307 expresses mere congressional concern about "public funds, not a desire to cabin Federal employees within specific physical boundaries." Def.'s Mot. at 14. As the defendants would have it, GSA can lease a building larger than 625,000 rentable square feet, even if the congressionally-approved prospectus said GSA would not do so, and even though the congressional committees' resolutions limited their approval to a maximum of 625,000 rentable square feet.[21]

Section 3307 has rarely been interpreted in judicial decisions. Nonetheless, courts have established that an appropriation is not "made available" to GSA without congressional approval of a project prospectus. *Maiatico v. United States*, 302 F.2d 880, 883-84 (D.C. Cir. 1962)

---

regulation is ambiguous." *Christensen*, 529 U.S. at 588. Here, nothing in Section 102 speaks to the provision of free space. In addition, to the extent the Pricing Desk Guide interprets chapter 5 of the FAR (the GSAR), 48 C.F.R. § 570.306(a) and 48 C.F.R. § 15.206(d) unambiguously foreclose consideration of offers that are inconsistent with factors stated in the solicitation. Thus, *Auer* deference is inappropriate.

[20]Even if the Pricing Desk Guide had authority here, the court would find that GSA failed to comply with its terms. Section 2.17.1 of the Guide provides that the "contracting officer must not consider the free space during negotiations or evaluations of a competitive lease action." Here, GSA manifestly did consider the free space in its evaluation of Eisenhower's offer. Thus GSA did not comply with the Pricing Desk Guide.

[21]RLP Section 3.05 says the says the "Government will award a Lease pursuant to this RLP only if the offered rental rate does not exceed said Congressionally-imposed rent threshold." AR 14-428.

(reversing a district court which had rejected a landowner's challenge to GSA's claim of right to condemn property where GSA had failed to send a prospectus to Congress for approval); *210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 718 (2006) (concluding that Section 3307 "would require the GSA to obtain Prospectus approval before executing a lease that exceeded" the cost threshold in Subsection 3307(a)). As the D.C. Circuit in *Maiatico* put it, "[t]he [Public Buildings] Act [of 1959] authorized the Administrator to acquire any building and its site by condemnation or otherwise, in order to carry out the purposes of the Act, but strictly in accordance with its provisions." *Maiatico*, 302 F.2d at 882. Even so, the court has found no precedents addressing GSA compliance with the terms of a prospectus or congressional resolutions stating conditions on that approval.[22] Accordingly, the court must interpret the statute from first principles, beginning with the plain text.

Pursuant to 40 U.S.C. § 3307(a), an "appropriation" for a lease in excess of $2.85 million "may be made only if" the Senate Environment and Public Works Committee and House Transportation and Infrastructure Committee "adopt resolutions approving the purpose" of that lease appropriation. 40 U.S.C. § 3307(a), (a)(1). GSA obtains that "approval" by sending a prospectus to Congress. 40 U.S.C. § 3307(b). The prospectus must give a "brief description" of the "space to be leased," provide an "estimate of the maximum cost to the [g]overnment," and include "a comprehensive plan for providing space for all [g]overnment officers and employees in the locality . . . having due regard for suitable space which may continue to be available in existing [g]overnment-owned or occupied buildings." 40 U.S.C. § 3307(b)(1)-(3).

The two committees of Congress then "adopt resolutions" that contain their approval (or disapproval, in theory) of the "purpose" of the lease appropriation. 40 U.S.C. § 3307(a). It is this "approval" of "purpose" in the resolutions that is required by Subsection 3307(a) as a pre-condition to availability of appropriations. *See* 40 U.S.C. § 3307(a) ("The following appropriations may be made only if [the committees] adopt resolutions approving the purpose *for which the appropriation* is made." (emphasis added)). The terms of the resolutions contain the "approval" contemplated by the statute, and congressional "approval" is accordingly determined by the resolutions.

This reading of Subsection 3307(a) is reinforced by Subsection 3307(c), which helps to illuminate the statutory scheme. *See BASR P'ship v. United States*, 795 F.3d 1338, 1343 (Fed. Cir. 2015) ("Under Supreme Court precedent, we cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").

---

[22]In *210 Earll*, the court considered whether a protestor would lack standing to bring a protest if no prospectus had been sent to Congress. In that case, the court held that Section 3307 barred appropriation of funds to execute a lease, but did not bar the award of the lease. It seems that in the *210 Earll* court's view, the prospectus could be sought *after* award of a lease. *210 Earll*, 77 Fed. Cl. at 718. This post-award-approved approach is contrary to the D.C. Circuit's view expressed in *Maiatico*. In any event, *210 Earll* is inapposite here because this court is presented with the question of whether GSA can deviate from the terms of a congressionally-approved prospectus with conditions stated in the committee's resolutions. In *Earll*, like *Maiatico*, there was no prospectus. Additionally, GSA and Eisenhower have executed the lease at issue.

Pursuant to Subsection 3307(c), GSA may exceed the "estimated maximum cost of any project approved under this section as set forth in any prospectus" described in Paragraph 3307(b)(2), so long as GSA does not exceed 10% of the estimated maximum cost. 40 U.S.C. § 3307(c). Section 3307 is otherwise silent about deviations from conditions on congressional approval. Because Section 3307 provides that that *cost* may deviate from the approvals only as permitted by Subsection 3307(c), this subsection "shows that Congress knew exactly how to provide" an exception to a congressional approval. *See Department of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002). In this context, the court should be cautious in interpreting Section 3307 as permitting GSA to depart from the congressional committees' conditions on approval with respect to non-cost factors. *See Elonis v. United States*, __ U.S. __, 135 S. Ct. 2001, 2023 (2015) (finding Congress knew how to require a heightened *mens rea*, and so finding its failure to do so significant); *see also Law v. Siegel*, __ U.S. __, 134 S. Ct. 1188, 1196 (2014) (finding that a code's "enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions.").[23]

On the facts of this case, GSA sent a prospectus to Congress saying the TSA lease would not exceed 625,000 rentable square feet. AR 64-5094. The prospectus further explained it would house TSA personnel with increased efficiency. *Id*. As of January 2014, TSA office space added up to 646,859 rentable square feet. But the proposed lease, by capping rentable

---

[23]Although Section 3307(a) requires congressional resolutions approving large GSA leases, it is not a legislative veto within the meaning of *Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 952-54 (1983). No party has raised this issue, but it deserves attention. In *Chadha*, the Supreme Court struck down a statute that allowed one house of Congress to reverse a determination of the Attorney General to not deport an immigrant, even though Congress had otherwise delegated deportation authority to the Attorney General. *Chadha*, 462 U.S. at 959; *see also Bowsher v. Synar*, 478 U.S. 714, 726-27 (1986) (summarizing *Chadha*). The *Chadha* court held that "[d]isagreement with the Attorney General's decision on Chadha's deportation – that is, Congress' decision to deport Chadha – no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way; bicameral passage followed by presentment to the President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." *Chadha*, 462 U.S. at 954-55.

Subsection 3307(a) does not run afoul of this constitutional separation-of-powers doctrine, because "it does not withdraw from the Executive authority previously delegated to it." *Letter to the Honorable Silvio O. Conte*, B-196854, 1984 WL 262173, at *1 (Comp. Gen. Mar. 19, 1984). "Since the executive branch has no authority to expend funds for public buildings without an authorization and, in most cases, a line item appropriation, the prospectus approval requirement is constitutionally permissible." *Id.* at *2. The congressional committees' approvals precede, not follow, the pertinent appropriation, and any conditions stated in the committees' approving resolutions flow through to the appropriation. This post-*Chadha* opinion of the Comptroller General supersedes pre-*Chadha* correspondence quoted and cited by the government. *See* Def.'s Supp. Br. at 4-5 (quoting Letter from Senators Randolph, Moynihan, Stafford, and Chafee to Rowland G. Freeman III, Administrator, GSA (June 26, 1980), Letter to the Honorable Daniel Patrick Moynihan from R. F. Keller, Comptroller General (Sept. 27, 1978)).

square feet at 625,000, would "house current personnel in 21,859 RSF less than the total of current occupancies." AR 64-5094. GSA's prospectus said "TSA will improve its office utilization rate from 103 USF to 84 USF per person and its overall utilization rate from 173 USF to 153 USF per person." *Id*. Thus the "space to be leased," as described by GSA, would be a space that reduced TSA's current footprint by capping rentable square footage at 625,000, and that would increase space utilization per person.

The resolutions adopted by the pertinent committees approving this plan restated the 625,000 rentable square foot cap and the plan for increased efficiency of space. *See* AR 65-5098 (House committee resolution stating: "[A]ppropriations are authorized for a replacement lease of up to 625,000 rentable square feet of space."); AR 66-5099 (Senate committee resolution stating: "[A] replacement lease of up to a maximum 625,000 rentable square feet of space . . . is approved."). The House committee also explicitly "[p]rovided that, the Administrator of General Services and tenant agencies agree to apply an overall utilization rate of 153 square feet or less per person." AR 65-5098. The terms of these resolutions provide the boundaries of congressional approval.

Defendants make three arguments that Section 3307 does not impose limits upon lease appropriations. The court addresses these arguments in turn, finding each unpersuasive.

First, defendants respond that the language contained in the congressional committees' resolutions of approval under Section 3307 are not binding, citing *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993), and *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 547 n.6 (Ct. Cl. 1980). Def.'s Supp. Br. at 2-3; Def.-Interv.'s Supp. Br. at 1-7, ECF No. 40. In *Vigil*, the court found that legislative history of lump-sum appropriations statutes, such as committee reports, could not "establish any legal requirements" on "what can be done with those [appropriated] funds." *Vigil*, 508 U.S. at 192 (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)). The defendants explain that federal leases are funded by lump-sum appropriations. "GSA finances its leasing operation from the Federal Buildings Fund, a fund established by 40 U.S.C. § 592[]. Money in the Fund is available for expenditure as specified in annual appropriation acts. 40 U.S.C. § 592(c)(1)." Def.'s Supp. Br. at 9; *see also* Def.-Interv.'s Supp. Br. at 4 (citing 40 U.S.C. § 592). "Congress acts upon this [approval of leasing operations] by making an annual lump-sum appropriation that does not contain any limitations upon the use of the funds *vis á vis* a particular prospectus description." Def.'s Supp. Br. at 9. Analogizing to decisions that find that legislative history cannot be used to place limits on a lump-sum appropriation, the defendants argue that the resolutions here cannot place limits on GSA's lump-sum appropriation. Def.'s Supp. Br. at 10; Def.-Interv.'s Supp. Br. at 4-5.

But *Vigil* does not help the defendants, because the resolutions in this case are not legislative history. They are instead mandated by statute in Subsection 3307(a). *Vigil* confirms that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in operative statutes (though not, as we have seen, just in the legislative history)." *Vigil*, 508 U.S. at 193. The Public Buildings Act is such an operative statute.

Second, the government cites a 1972 presidential signing statement of the Public Buildings Amendments, Pub. L. No. 92-313, 86 Stat. 216-18, asserting that this statement shows

that Section 3307 does not impose mandatory conditions on appropriations. Def.'s Supp. Br. at 3-4.[24]  The government quotes President Nixon as saying "Congress regards this 'no appropriation may be made' provision as internal Congressional rulemaking which does not affect the executive branch." Def.'s Supp. Br. at 4 (quoting *Presidential Statement on Signing the Public Buildings Amendments of 1972*, 1972 Pub. Papers 686 (June 17, 1972)).  But the government quotes President Nixon out of context.  In full, the President's signing statement asserted that the statute was unconstitutional as a separation-of-powers violation because it "condition[ed] the use of that [contracting] authority on that agency's getting the approval of the Public Works Committees on prospectuses." *Presidential Statement on Signing the Public Buildings Amendments of 1972*, 1972 Pub. Papers 686.  To remedy what he saw as a separation-of-powers problem, the President ordered GSA to "cooperate" with Congress according to this statute. *Id.*  Thus, the signing statement shows that any condition on appropriations imposed via what became Section 3307 was viewed by the President as problematic only on separation-of-powers concerns.  And, eleven years later, those issues were addressed by the Supreme Court in *Chadha*, the resolution of which did not impair the operation of Section 3307.

Finally, the government cites *444 4th Street Ltd. P'ship v. United States*, No. 90-2951, slip. op. at 4 (D.D.C. Jan. 11, 1991) (Gesell, J.), reproduced at Def.'s Supp. Br. App., A5 to A13, for the proposition that Section 3307 is an "enactment providing no cause of action," and thus provides no basis for relief in this case. Def.'s Supp. Br. at 5 (quoting *444 4th Street*, slip op. at 4).  The government, however, misquotes and miscites that decision, and it actually supports Springfield's position.  In *444 4th Street*, Judge Gesell opined that Subsection 606(a), the predecessor of Subsection 3307(a), "[w]as a congressional monitoring enactment providing no *private* cause of action." *444 4th Street*, slip. op. at 4 (emphasis added).  He was addressing Subsection 606(a) in the context of a bid protest, which at the time, before the operation of the sunset provision in the Administrative Dispute Resolution Act, could be filed in district courts.  And, immediately after observing that Subsection 606(a) provided no private cause of action, he proceeded to analyze the merits of a claim that a lease award by GSA was invalid because it exceeded the maximum cost presented to congressional committees. *Id.* at 4-5.  He concluded that the limitation on cost had not in fact been exceeded. *Id.*  As he then put it, "[w]ith this basic issue of the legality of the award to [the lessor] resolved," the bid protest was unavailing. *Id.* at 5.  In short, while Subsection 606(a), now Subsection 3307(a), might not provide an independent basis for a *private* cause of action it could, and in *444 4th Street* did, supply a basis for a claim of a contravention of law in a bid protest.  Thus the decision in *444 4th Street* supports Springfield's position in this case, not that of the government or Eisenhower.

Moreover, both the Third Circuit and the D. C. Circuit have concluded that a bid protestor and a property owner contesting a condemnation, respectively, could invoke then-Section 606 as a statutory ground for relief against action by GSA, where jurisdiction was

---

[24]The prospectus submittal and approval requirements were first enacted as Section 7 of the Public Buildings Act of 1959. *See* Pub. L. No. 86-249, § 7, 73 Stat. 480 (initially codified at 40 U.S.C. § 606).  Application of Section 7 to lease actions was added as part of the Public Buildings Amendments of 1972. Pub. L. No. 92-313, § 2(4), 86 Stat. 217-18.  Section 7 was moved to its current position at 40 U.S.C. § 3307 in 2002. *See* Pub. L. No. 107-217, § 1, 116 Stat. 1161.

otherwise present.  *See Merriam v. Kunzig*, 476 F.2d 1233, 1240-44 (3d Cir. 1973) (holding that an unsuccessful bidder for an award of a 20-year lease of office space to the government had standing to invoke Section 606 in protesting the award of the lease to another offeror); *Maiatico*, 302 F.2d at 883-84 (ruling that a landowner who was contesting a condemnation could invoke GSA's failure to comply with Section 606 as a ground for barring the condemnation).  Here, Subsection 1491(b), which incorporates Section 706 of the APA, provides a vehicle for this court to review violations of procurement law.  In the context of this bid protest, a contractor who is competitively harmed by a violation of Section 3307 is within the class of persons protected by the statute.  Thus, defendant's objections to the court's consideration of GSA's compliance with Section 3307 are unavailing.

The court has determined that pursuant to Subsection 3307(a), the committee resolutions created binding conditions upon the availability of appropriations.  Appropriations for TSA headquarters were accordingly available only for a lease of up to 625,000 square feet because that was the limit included in the resolutions adopted by the relevant congressional committees.  40 U.S.C. § 3307(a).[25]  Because no appropriation has been made for a space exceeding 625,000 rentable square feet, the lease signed by the government and Eisenhower triggers the Anti-Deficiency Act, 31 U.S.C. § 1341, which provides that an "officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation . . . unless authorized by law."  31 U.S.C. § 1341(a)(1)(A), (B).

Defendants argue that even if GSA violated Section 3307, GSA's conduct was "authorized by law" within the meaning of the Anti-Deficiency Act because of the effect of 40 U.S.C. § 585(a)(2).  Def.'s Supp. Br. at 9-10; Def.-Interv.'s Supp. Br. at 8.  That contention is without merit.  Paragraph 585(a)(2) provides that GSA may enter into leases for up to 20 years, "and the obligation of amounts for a lease under this subsection is limited to the current fiscal year for which payments are due without regard to section 1341(a)(1)(B) of title 31."  40 U.S.C. § 585(a)(2).  Nonetheless, GSA's leasing activities are not immune from the Anti-Deficiency Act.  Instead, Paragraph 585(a)(2) directs GSA "to obligate funds for its multiyear leases one year at a time."  3 Government Accountability Office, *Principles of Federal Appropriations Law*, § 13.E.1.b, at 13-127 (3d ed. Sept. 2008).  As discussed earlier, Congress appropriates funds for federal leases anew each year.  The reference to the Anti-Deficiency Act in Paragraph 585(a)(2) establishes that GSA may enter into a multi-year lease, even though money is obligated one year at a time, without contravening the Anti-Deficiency Act.

The decision in *Leiter v. United States*, 271 U.S. 204 (1926), provides context for this understanding of 40 U.S.C. § 585(a)(2).  Prior to enactment of Paragraph 585(a)(2), if GSA entered a lease for several years "under an appropriation available but for one fiscal year," the lease would be binding "only for that year" because of the Anti-Deficiency Act.  *Leiter*, 271 U.S.

---

[25]GSA had a remedy.  It could have cured this defect by submitting a revised Prospectus to the congressional committees and requesting approval of the changed terms.  Because it chose not to do so, the defect in approval remains.  This circumstance parallels GSA's failure to amend the RLP to revise the maximum space to be leased, a material term of the RLP.

at 207.  Paragraph 585(a)(2) undid that result.  But it did not exempt GSA leases from the Anti-Deficiency Act.

In this instance, GSA's violation of Subsection 3307(a) means that no appropriation was available for the lease for TSA headquarters.  Without an appropriation, GSA's lease with Eisenhower is void *ab initio*.  *See Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 81 (D.D.C. 2007) (finding contract void *ab initio* pursuant to 31 U.S.C. § 1341(a)(1)(B) when made before an appropriation); *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C. 2006) ("[T]he Supreme Court of the United States and other federal courts have explicitly and repeatedly held that all contracts for future payments of money, in advance of or in excess of existing appropriations, are void ab initio.") (citing *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996); *Goodyear Tire & Rubber Co v. United States*, 276 U.S. 287 (1928); *Leiter*, 271 U.S. at 207).[26]

Accordingly, the lease entered by GSA with Eisenhower for Victory Center is contrary to law, void, and must be set aside.

## C.  *Other Asserted Protest Grounds*

Springfield raises other grounds for its protest, none of which are material to the outcome of this case.

### 1.  *Whether GSA improperly concluded that no Environmental Impact Statement was needed.*

Springfield contends that GSA arbitrarily concluded that no EIS was needed for Victory Center, arguing that GSA's EA and FONSI "fail to consider and analyze" the [***] square foot annex proposed in Eisenhower's final offer.  Pl.'s Mot. at 25-28.[27]  In support of this argument, Springfield points to preambular language of the EA and FONSI, which describe Victory Center as "an unoccupied 606,000 GSF office building" that would "undergo [an] expansion consisting of 60,000 GSF of office space and 10,000 GSF of retail space."  Pl.'s Mot. at 25 (citing AR 47-4218; AR 49-4486).  Because this description fails to account for the [***] square foot annex and rather evidently refers to the existing building plus the addition contemplated by Eisenhower's initial proposal, Springfield asserts that GSA's FONSI does not account for the environmental impact of the annex.  Pl.'s Mot. at 25-27.

---

[26]The government additionally argues that the Anti-Deficiency Act is directed only at money, and because in this case the government exceeded only the 625,000 rentable square feet term of the resolutions and not the rental rate or total annual cost designated in those resolutions, there is no Anti-Deficiency Act violation.  Def.'s Supp. Br. at 8.  This argument misapprehends Section 3307(a).  Congress approved appropriations only for a building not exceeding 625,000 rentable square feet.  No appropriation was made available for a building exceeding this amount.

[27]Springfield also argues that the traffic report attendant to the EA failed to consider the additional structure.  However, the location of the Victory Center site and the number of employees to be housed by TSA remained consistent throughout.

Bid protests in this court apply the same APA standard of review as that applied in NEPA challenges.  In this instance, NEPA compliance was incorporated into the solicitation, and so this court reviews the agency's action under the terms of the solicitation.  That NEPA challenges to agency action are ordinarily filed in district courts where they are reviewed pursuant to 5 U.S.C. § 706(2)(A), *see supra*, at 11 n.11 (discussing *Brodsky*, 704 F.3d at 118-19), does not displace this court's bid protest jurisdiction or otherwise constrain this court's review of GSA's actions in implementing NEPA.  *See Norby Lumber Co. v. United States*, 46 Fed. Cl. 47, 52 (2000) (declining to dismiss counts of complaint stating NEPA violations and asserting that "even the invocation of a statutory right will not permit a plaintiff to escape the Tucker Act's exclusive jurisdiction and its preclusion of an APA waiver of sovereign immunity if the relief that plaintiff seeks would have the actual effect of money damages." (quoting *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 n.5 (9th Cir. 1985)).  In short, the court has jurisdiction to entertain GSA's compliance with NEPA in this bid protest particularly because that compliance was incorporated into the solicitation.

Springfield is correct that factually the EA and FONSI are partially inaccurate, to the extent they describe Victory Center as a "606,000 GSF" building that would undergo a "60,000 GSF" addition.  The court is nonetheless satisfied that the EA and FONSI did consider the environmental impacts of Eisenhower's proposed renovations and additions to Victory Center, including the [***] square foot annex.  First, GSA transmitted Eisenhower's final proposal, including the additional annex, to its environmental consultants at Stantec.  AR 50-4673 to -4680 (artistic renderings); AR 50-4718 to -4723 (two-dimensional aerial views); AR 50-4817 to -4819.  Stantec's awareness of the annex is important because Stantec had a major role in GSA's preparation of the EA.  AR 47-4191.  Second, the EA does refer to the [***] square foot annex.  AR 47-4222, -4249 (soil analysis referring to a "4-story addition.").  The proposed annex was a four-story structure, and so this reference must be to the annex.  AR 33-3499 (Eisenhower's offer document, showing a four-story annex).  The surface water and wetlands analysis mentioned a "building addition," as did the groundwater and hydrology report.  AR 47-4222.  Third, the EA's environmental contamination report refers to excavation on the east and west sides of the pre-existing building at Victory Center for "[c]onstruction of the proposed . . . addition."  AR 47-4251.  This is consistent with Eisenhower's proposal to build the new annex on the west side of the pre-existing building.  AR 33-3535.  And, although the FONSI itself does not appear to reference the annex, this omission does not mean that the FONSI failed to consider the annex because the FONSI was based upon the EA.

In sum, the court cannot say that GSA arbitrarily concluded under RLP 5.01(K) that an EIS need not be prepared for Victory Center.  The agency considered the relevant facts and explained its decision appropriately.  *State Farm*, 463 U.S. at 43.  The court finds this aspect of Springfield's protest to be without merit.

2. *Whether GSA's present-value price evaluation was inconsistent with the solicitation's evaluation criteria.*

Springfield further asserts that GSA's present-value price evaluation of Victory Center was "fatally flawed" because it was inconsistent with the solicitation's stated criteria or

otherwise unreasonable.  Pl.'s Mot. at 28.  Springfield points to two alleged flaws in the price evaluation: (1) that GSA failed to consider the price of Victory Center's "second building" or annex in its evaluation, and (2) that GSA failed to recognize and account for the fact that the Victory Center price proposal "was dependent upon a substantial tax abatement with an aggregate value of $[***] million that has yet to be provided by the City of Alexandria."  Pl.'s Mot. at 28-29.  As Springfield would have it, these two errors led to "unequal treatment" between the Victory Center and Springfield proposals, which is "fundamentally arbitrary and capricious, and violates the full and open competition mandated . . . in 41 U.S.C. § 3301(a)."  Pl.'s Mot. at 29 (quoting *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 742 (2014)).

       As previously discussed, Section 4.04 of the RLP specified the "Present Value Price Evaluation" criteria for evaluating offers.  AR 14-432 to -434.  This evaluation was intended to "reduc[e] the prices per ABOA SF to a composite annual ABOA SF price."  AR 14-433.  GSA performed this evaluation using a "present value analysis" spreadsheet, publically available on GSA's website, based on the criteria outlined in Section 4.04 of the RLP.  Def.'s Reply at 12; *see also* AR 37-4048 to -4052 (Victory Center's completed present value analysis spreadsheet); AR 38-4058 to -4062 (Springfield's complete present value analysis spreadsheet).[28]  The information needed for the spreadsheet was taken from the offerors' proposals, specifically from GSA Form 1217 (Lessor's Annual Cost Statement), GSA Form 1364C (Proposal to Lease Space), the security unit price list, and the brokerage commission agreement, if applicable.  Def.'s Reply at 11-12; *see also* AR 14-426 to -427 (requiring offerors to submit this information for the pricing evaluation); AR 33-3517 to -3518 (Victory Center's final Form 1364C); AR 34-3555 to -3556 (Springfield's final Form 1364C).  Based on this evaluation, Victory Center's present value per USF (ABOA SF) was determined to be $[***], AR 37-4048,[29] and Springfield's present value per USF was determined to be $[***], AR 38-4058.[30]

       After reviewing the present-value price evaluation calculations and methodology in the administrative record, as well as the explication provided in the defendants' reply briefs, the court is satisfied that GSA's present-value price evaluation was conducted in accord with the RLP criteria such that it did not unfairly prejudice Springfield.  With regard to the first alleged flaw in the evaluation, Springfield points to the proposed full-service rate for Victory Center of $[***]/RSF and $[***]/USF, AR 33-3517 (Form 1364C), and asserts that these prices are inconsistent with prices listed elsewhere in Victory Center's final proposal, AR 33-3516 (Offer

---

[28]On October 28, 2015, the court ordered the government "to explicate and spell out from the administrative record how the General Services Administration calculated the present value analyses for Victory Center and Springfield."  Order, ECF No. 31.  In response, the government explained that the criteria identified in RLP Section 4.04 for the present-value price evaluation are standardized for GSA lease procurements through the standard-form RLP, Form R101C.  Def.'s Reply at 12 n.3.

[29]The present value for Victory Center was calculated on the basis of [***] USF.  AR 37-4048.

[30]The present value for Springfield was calculated on the basis that its offered building would provide [***] USF.  AR 38-4058.

Clarifications for Form 1364C (stating the building shell credits as "Total Existing Building[:] $[***]/USF[,] Total New Building[:] $[***]/USF")). Pl.'s Mot. at 28. Springfield asserts that these differing prices are evidence that GSA did not consider the cost of the new Victory Center annex in its price evaluation. *Id.* However, Springfield's argument mistakenly conflates the full service rates reported by Victory Center on Form 1364C with the building shell credits it reported in the Offer Clarifications document preceding the form. As the government explained, the building shell credits are derived on the basis of a separate calculation designed to give the government the option, after the lease is executed and interior improvements are planned, to relieve the lessor of its obligation to provide a "warm lit shell" to the extent of the items listed in the building shell credit, in exchange for a commensurate increase in the tenant improvement allowance. Def.'s Reply at 14-15. In other words, the building shell credits have no relation to the full service rates reported on Form 1364C with regard to the present-value analysis performed by GSA. *Id.* Contrary to Springfield's assertion, the completed present-value analysis spreadsheet for Victory Center reflects the costs reported by Victory Center in its final proposal on the appropriate forms and documents, which includes the cost for both the existing building and the new annex. *See, e.g.*, AR 37-4048 to -4049 (reflecting calculations based on the final proposed RSF of 625,000, ABOA/USF of [***], and total annual rent of $[***], as reported on Victory Center's Form 1364C).

Springfield's second alleged flaw in the evaluation—that it erroneously did not account for Victory Center's expected tax abatement—is similarly unpersuasive. Springfield points to Rider No. 1 to the lease executed between GSA and the defendant as evidence that Victory Center's proposed price was predicated on a tax adjustment provision proposed by the Alexandria City Council, but which has not yet been finalized. Pl.'s Mot. at 28-29.[31] However, although Springfield suggests this leads to an error in the present-value price evaluation, there is no provision in Section 4.04 that prohibits offerors from including a conditional tax abatement in their proposed prices. *See* AR 14-432 to -434. Furthermore, the proposed tax abatement was not mentioned in Victory Center's final proposal, and GSA Forms 1217 and 1364C only require offerors to report "current real estate taxes" in their annual cost statement, which in turn is a component of their proposed "shell rent." *See, e.g.*, AR 37-4053 (instructing offerors in Line 16 of Form 1364C to include "current real estate taxes" as reported in Line 28 of Form 1217). Since the proposed tax abatement would only affect tax assessed on construction of the new annex and improvements to the existing building, it would neither have affected the estimated "current real estate taxes" reported as part of the Victory Center proposal, nor would it have affected GSA's present-value price evaluation.

Accordingly, the court has concluded that GSA's present-value price evaluation of the Victory Center proposal was not inconsistent with the terms of the RLP, nor was it otherwise prejudicial to the plaintiff. This protest ground is denied.

---

[31]The Rider recites that "the [t]ax [a]batement would be given for 100% of the assessed value of the [***] for the TSA headquarters. The land and the existing building in its current condition, will remain fully taxable." AR 60-5087. The Rider's purpose was to clarify the operation of the tax abatement expected from the City of Alexandria within the context of the standard Real Estate Tax Adjustment provision of the lease (§ 2.07), which contains relatively indefinite language about a possible tax abatement. *See* AR 60-5052.

3.  *Whether Eisenhower failed to obtain the necessary approvals for retail space.*

Springfield argues GSA irrationally evaluated Eisenhower's proposal to construct [***] square feet of retail space.  Pl.'s Mot. at 30.  Section 3.06(C) of the RLP provides that the offeror must submit either (1) proof that the proposed space is "in compliance with local zoning laws," or (2) an acceptable "plan and schedule to obtain all necessary zoning approvals prior to performance."  Pl.'s Mot. at 30 (quoting RLP Section 3.06(C), AR 14-428).  In compliance with this RLP provision, Eisenhower submitted extensive plans for obtaining all necessary zoning approvals and permits for the retail space.  *See* AR 21-930 to -931, -1024 to -1100; AR 41-4109 to -4110, AR 4111 to -4186.  Accordingly, the court finds GSA did not irrationally conclude that Eisenhower's offer complied with this RLP provision.  This aspect of the protest is denied.

4.  *Whether Victory Center failed to meet handicap accessibility requirements.*

Springfield argues that Victory Center is more than 2,640 walkable linear feet from an existing Metrorail station, contrary to RLP Section 1.04.  Pl.'s Mot at 31-34.  However, GSA's Contracting Officer personally measured the distance between Victory Center and the nearest Metro station, finding the distance to be slightly less than 2,640 walkable linear feet.  AR 51-4969, -4971.  GSA thus rationally concluded that Victory Center satisfied RLP Section 1.04.

5.  *Whether the GSA gave Eisenhower an unfair advantage by including a risk-shifting clause in the final lease.*

Finally, Springfield argues that the government's inclusion of a risk-shifting clause in its final lease with Eisenhower was improper and unfair.  Pl.'s Mot. at 34-35.  The clause, located in Section 7.08 of the lease, provides that the lessor "shall not be responsible for [***]."  AR 60-5086.  Springfield argues it did not know a winning offeror would have the benefit of a clause of this nature, and "had it known," it "could and would have revised its price proposal."  Pl.'s Mot. at 34.  This argument does not show that GSA favored Victory Center, because there is no evidence Victory Center knew that the final lease would include this clause.  Victory Center requested a risk-shifting clause, but the record contains no evidence that Victory Center knew before its final offer that the final lease would include such a clause.  The government's decision to include the risk-shifting clause does not show that it acted arbitrarily.

D.  *Whether Springfield Was Prejudiced*

Relief in a bid protest may be available to protestor only if it demonstrates that it was prejudiced by the error.  *Per Aarsleff*, 121 Fed. Cl. at 634 (citing *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 203 (2004), *aff'd* 389 F.3d 1219).  The protestor must show that there was a substantial chance it would have received the contract award, but for the alleged error in the procurement process.  *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 712 (2013).  This inquiry into prejudice is separate from the inquiry into standing.  *Per Aarsleff*, 121 Fed. Cl. at 634.  "While both use the 'substantial chance' doctrine, prejudice at the jurisdictional threshold can be satisfied on the basis of the plaintiff's allegations, whereas prejudice on the merits can only be

33

satisfied by the effect of an agency decision adjudged to be unlawful." *Hyperion, Inc. v. United States*, 115 Fed. Cl. 541, 556 (2014); *see also Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 695-96 (2010).

Here, GSA knowingly awarded the lease to an offeror who exceeded the solicitation's 625,000 rentable square foot maximum and who had to provide "extra" space to meet the RLP's minimum efficiency layout requirements. By doing so, GSA contravened the FAR, the material terms of the solicitation, and 40 U.S.C. § 3307(a). Springfield's offer was technically acceptable, and it was second lowest in price after Eisenhower. If GSA had properly analyzed these offers, it would not have accepted Eisenhower's offer and there is a substantial chance Springfield would have won. Accordingly, Springfield was prejudiced by GSA's errors.

## E. *Whether Equitable Relief Is Warranted*

To a large extent, any discussion of the proprietary of injunctive relief in this instance may be academic because the alternative, independent ground for relief based upon 40 U.S.C. § 3307 renders the resulting lease to Eisenhower void. Nonetheless, because Springfield's primary ground for relief is that GSA contravened a material term of the RLP in awarding the lease to Eisenhower, the court will address the factors governing equitable relief.

In a bid protest, the court is empowered to award "any relief that the court considers proper, including declaratory and injunctive relief." *Centech*, 554 F.3d at 1037 (quoting 28 U.S.C. § 1491(b)(2)). "To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Id.* (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). The court "is free to consider the appropriateness of declaratory relief," taking into account whether a declaration will resolve the dispute. *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1271 (Fed. Cir. 1999).[32]

Regarding equitable relief, Springfield has succeeded on the merits, and so the court turns to the remaining three factors. The "loss of potential work and profits from a government contract constitutes irreparable harm." *Per Aarsleff*, 121 Fed. Cl. at 634; *Furniture by Thurston*, 103 Fed. Cl. at 520 (same); *ViroMed Labs, Inc. v. United States*, 87 Fed. Cl. 493, 503 (2009) (same); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) (same); *see also O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992). Monetary relief under the Tucker Act is limited only to bid preparation and proposal costs, which "are not equivalent to potential profits from a government contract." *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 696 (2012) (citing *ViroMed*, 87 Fed. Cl. at 503 for this proposition). Competitive detriment to plaintiffs stemming from a denial of a fair

---

[32]Because a declaratory judgment may have an effect comparable to that of an injunction, *see PGBA*, 389 F.3d at 1228 (quoting *PGBA*, 60 Fed. Cl. at 220), the "propriety of declaratory and injunctive relief should be judged by essentially the same standards," *id.* (quoting *Samuels v. Mackell*, 401 U.S. 66, 72 (1971)).

opportunity to participate in a lawful procurement process "also engenders irreparable harm." *Per Aarsleff*, 121 Fed. Cl. at 635; *see also Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). For these reasons, GSA's procurement errors will irreparably harm Springfield absent injunctive relief.

The balance of hardships between the parties also favors injunctive relief. The government argues that because it already signed a lease with Eisenhower, an injunction by this court would expose the government "to hundreds of millions of dollars in potential breach damages, millions of dollars to pay in [***], inflation costs, and the loss of costs sunk in this procurement." Def.'s Mot. at 29. This is because, in the government's view, the termination-for-convenience clause in the lease can be used only for certain environmental reasons not present here. The government also claims an injunction will cause years of delay to the process of placing TSA in a new headquarters. However, the court finds the government's arguments on this ground unpersuasive for four reasons.

First, "whether there is an enforceable contract between these parties does not change this Court's jurisdiction to give appropriate relief, including vacating the award, if we conclude that the Government committed reversible error in the procurement process." *210 Earll*, 77 Fed. Cl. at 717-18. Second, evidence in the record shows that GSA knew it could face a post-award bid protest in this procurement, but dismissed the risk of that possibility. AR 68-5105. Despite foreseeing a protest, GSA chose to execute the lease with Victory Center. GSA now argues that its decision cannot be undone. If the court were to accept this argument, it would mean that GSA could immunize itself from post-award injunctive relief by signing flawed contracts and then claiming in court that the awards cannot be vacated. It would be inequitable to permit the government "to preserve its ill-gotten gain" in such a manner. *See Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994). Third, it is possible that the rule of *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963), implies a general termination-for-convenience clause in the lease. There is a split of authority on this subject, and the court expresses no opinion as to the answer. *Compare Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 374 (1994), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994) (order on stay pending appeal) (rejecting argument that equitable relief would force a breach, because the *Christian* doctrine implies a termination-for-convenience clause in GSA leases), *with SWD Assocs. Ltd. P'ship v. General Servs. Admin.*, No. 87-2719, 1988 WL 242629, at *3 (D.D.C. 1988) (holding that *Christian* does not imply a termination clause into GSA leases).[33] Fourth, if the government

---

[33]The lease at issue does contain a conditional termination-for-convenience clause, which by the parties' consent to the extension of this court's TRO will remain effective until November 12, 2015. *See* Joint Status Report (Sept. 30, 2015), ECF No. 13. That termination-for-convenience clause is tailored to cases in which the contracting officer, "in his discretion, determines that a public comment(s) from the Public Review (PR) of the Environmental Assessment . . . has merit and would impact work related to the existing building(s) and proposed new construction that would prevent the completion of the project." AR 60-5086. The government avers, through its contracting officer, it does "not see anything in [Springfield's] protest that relates to these conditions, so [it] disagree[s] that this clause could be used if [Springfield] wins this protest." Def.'s Mot. at A2 (Decl. of Mark Stadsklev (Oct. 23, 2015)), ¶ 10.

is correct, then all of GSA's leases are immune from post-award injunctive relief. This cannot be correct. Congress could not have intended in enacting the Competition in Contracting Act, 31 U.S.C. §§ 3301, 3304, 3551-3556, and the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (codified in relevant part at 28 U.S.C. § 1491(b)(1)), to grant GSA such sweeping immunity.

The court finds that the balance of harms favors entry of an injunction. Harm to Eisenhower does not alter this balance, because the process by which Eisenhower received the contract was itself flawed. *Al Ghanim Combined Grp. Co. v. United States*, 56 Fed. Cl. 502, 520 (2003). Although the government may suffer economic harms, the "burden of reprocurement costs occurs whenever an improper award of a contract is set aside," and that alone does not affect the balance of harms here. *Per Aarsleff*, 121 Fed. Cl. 635.

Turning finally to the public interest, maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction. *Per Aarsleff*, 121 Fed. Cl. at 635 (citing *Hyperion*, 115 Fed. Cl. at 557). "The public interest is best served by abiding by the required eligibility criteria and evaluative steps in a procurement." *Id.* at 636 (citing *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013)). Accordingly, the court finds that an injunction is warranted, and GSA's award to Eisenhower shall be set aside.

Because GSA contravened 40 U.S.C. § 3307(a) and thus failed to acquire appropriations for this lease, the GSA also violated the Anti-Deficiency Act, and so the court declares the lease void *ab initio*. *See Davis & Assocs.,* 501 F. Supp. 2d at 81; *Williams*, 902 A.2d at 94 (citing *Hercules*, 516 U.S. at 427; *Goodyear Tire & Rubber*, 276 U.S. 287; *Leiter*, 271 U.S. 204).

## CONCLUSION

For the reasons stated, Springfield's motion for judgment on the administrative record is GRANTED. The government's and Eisenhower's motions to dismiss and their cross-motions for judgment on the administrative record are DENIED. The award by GSA to Eisenhower is set aside, and GSA is enjoined from proceeding with the lease to Eisenhower. As an alternative, separate, and independent ground for relief, the court also declares that the lease to Eisenhower is void. The clerk is directed to issue final judgment in accord with this disposition.

Springfield is awarded its costs of suit.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge